IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:17-cr-00116 |
| Plaintiff, | : | Judge Susan J. Dlott |
| v. | : | **ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE** |
| JOSHUA KERSEY, | : | |
| Defendant. | : | |

This criminal proceeding is before the Court on Defendant's Motion to Suppress Evidence (Doc. 19), which the United States has opposed (Doc. 21). At Defendant's request and to further develop the record, an evidentiary hearing took place on December 18, 2017. Post-hearing briefs were filed (Docs. 25–27), and this matter is now ripe for the Court's decision. For the reasons that follow, Defendant's Motion will be DENIED.

I.  **BACKGROUND**[1]

On May 14, 2017, Hamilton County Deputy Sheriff Joshua Hawthorne was working a routine patrol in District 3, which covers Sycamore Township and includes the Kenwood Towne Centre shopping mall. (Doc. 24 at PageID 65–66.) He was inside his marked patrol vehicle, which was parked in the fire lane outside Entry No. 6 (between Macy's department store and Red Robin restaurant) completing an unrelated theft report, when he noticed Defendant walk in front of his vehicle. (*Id.* at PageID 66, 85–86.) Defendant "caught [his] eye because he was just walking aimlessly looking around. . . . kind of like he was either intoxicated or . . . didn't have a

---

[1] Background facts are drawn from the testimony given and the exhibits introduced at the December 18, 2017 hearing. (Transcript, Doc. 24.) There is no dashboard or body-worn camera recordings of the traffic stop that led to Defendant's arrest and indictment. (*Id.* at PageID 71.)

1

clear head of some sorts." (*Id.* at PageID 67, 71, 85.) Hawthorne noticed "numerous old track marks on [Defendant's] arm by use of possible needles." (*Id.* at PageID 67.) He radioed mall security to "put [Defendant] on camera" as he entered the building. (*Id.* at PageID 68–69.) Hawthorne observed Defendant enter the mall, remain inside for only 20 seconds or so, and leave. Defendant then got into the passenger seat of a vehicle—a Toyota Camry—that, according to mall security, backed out of a dedicated parking spot—and drove through the parking lot—at a "higher" rate of speed. (*Id.* at PageID 69–70.)

Once the vehicle had exited the mall parking lot onto Kenwood Road, Deputy Hawthorne resolved to "find a reason to pull the car over and see what's going on." (*Id.* at PageID 70.) That reason came when the driver of the vehicle signaled to change lanes and "instantaneously" did so, in violation of an Ohio traffic law that requires a driver to signal for at least 100 feet before changing lanes. (*Id.* at PageID 72–73, 103.)[2] Hawthorne activated his lights and stopped the vehicle in a strip mall parking lot a block away. (*Id.* at PageID 73.)

Deputy Hawthorne approached the vehicle and asked the driver for his license and registration, which were provided. (*Id.* at PageID 73, 104.) He then asked Defendant "if he knew his name." (*Id.* at PageID 73, 108.) Defendant gave him the name "Joshua Thompson" and apparently also provided a date of birth. (*Id.* at PageID 73–74.) Hawthorne then returned to his cruiser. (*Id.* at PageID 74.) He determined that the driver's license was valid but "nothing was coming back" vis-à-vis Defendant. (*Id.*) By this point Hawthorne's partner, Deputy Rechtin, had arrived on scene, and, at Hawthorne's request, Rechtin approached the vehicle and asked Defendant for his social security number. (*Id.* at PageID 74, 114, 117.) The number Defendant gave came back to a female. (*Id.* at PageID 79.) At this point, Hawthorne "decided to

---

[2] *See* Government Exhibit 7, Ohio Rev. Code § 4511.39 ("Use of signals for stopping, turning, decreasing speed, moving left or right; limitations"). While "not the easiest thing in the world" to gauge, Deputy Hawthorne estimates that 100 feet would amount to "at least three signal blinks if you're traveling on the road." (Doc. 24 at PageID 103.)

2

pull" Defendant from the car and place him in his cruiser. (*Id.* at PageID 80.) Once inside, Hawthorne told Defendant, "You're just digging yourself a hole. Why don't you give me your correct information[?]" (*Id.*) Explaining that he lied because he thought he "had a warrant out of Kentucky," Defendant then provided Hawthorne with his actual social security number. (*Id.*) No warrant came up, but a computer check revealed Defendant's identity as Joshua Kersey. (*Id.*)

Meanwhile Officer Andrea Alt, from the neighboring jurisdiction of Amberley Village, arrived on scene with her K-9 partner, Creed,[3] who alerted to the driver's side (passenger door seam) of the vehicle. (*Id.* at PageID 154–55, 158.) Deputy Hawthorne had messaged Alt shortly after he "called" the traffic stop[4] "[d]ue to the recent not contact but observations of Mr. Kersey, being that possibly he was drug dependent, possibly [ ] intoxicated." (*Id.* at PageID 77–80, 146.) Alt assisted Hawthorne in searching the vehicle and "almost got stuck with a needle that was pointing straight up." (*Id.* at PageID 155.) She also discovered a revolver under the passenger seat, "and some rounds on the floor." (*Id.* at PageID 156.) Hawthorne took these items "into his custody and placed them into evidence." (*Id.*)

After the vehicle was "cleared," Deputy Hawthorne returned to his cruiser and orally advised Defendant of his *Miranda* rights.[5] (*Id.* at PageID 81, 130.) According to Hawthorne, Defendant admitted the weapon, syringe, and rounds were his. (*Id.*) Hawthorne then said, "I looked at your history. You shouldn't even have a firearm due to being a convicted felon." (*Id.*) In reply, Defendant told Hawthorne "it's the life he lives." (*Id.* at PageID 81–82, 130.)

---

[3] K-9 Creed is state certified as both a narcotics detection dog (to include marijuana, cocaine, heroin, methamphetamines, and their derivatives) and a patrol dog (meaning he can track suspects by detecting human odor). (*Id.* at PageID 146–49, 162; Government Exh. 3.)

[4] Deputy Hawthorne explained that his practice is to "call out" his stop before he actually stops a vehicle:

> That way I have all the information in case the vehicle does not stop. It's out there over the air. And if we stop somewhere else, I can just give an update on the location.

(*Id.* at PageID 78.)

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

3

Hawthorne placed Defendant under arrest, charging him with obstructing official business, possession of a drug abuse instrument, and having a weapon under disability. (*Id.* at PageID 82–83.)

Defendant is charged in the Southern District of Ohio with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), 924(a)(2), and 2.

## II. ANALYSIS

"An ordinary traffic stop by a police officer is a 'seizure' within the meaning of the Fourth Amendment." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). Thus, evidence seized during an illegal traffic stop "must be suppressed as 'fruits of the poisonous tree.'" *Id.* (citing *United States v. Hill*, 195 F.3d 259, 264 (6th Cir. 1999) (quoting *Wong Sun v. United States*, 371 U.S. 471, 484 (1963))). It is well-established, however, that a police officer "lawfully may stop a car when he has probable cause to believe that a civil traffic violation has occurred." *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012).

A traffic stop, though, is limited by its purpose and may "last no longer than is necessary to effectuate th[at] purpose." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* (citation omitted).

Defendant contends that Deputy Hawthorne extended the traffic stop of the Toyota Camry beyond the time necessary for the turn signal violation. (Post-Hearing Brief of Defendant Joshua Kersey, Doc. 25 at PageID 172.)[6] He detained the Camry for several additional minutes

---

[6] The Court presumes, based on the evidence adduced at the hearing, that Defendant has abandoned all other challenges initially set forth in his Motion (*see* Doc. 19 at PageID 45–48).

4

while he investigated Defendant "without reasonable suspicion of any criminal conduct" in violation of his Fourth Amendment rights. (*Id.*) Accordingly, Defendant asks the Court to suppress all evidence derived from that stop and from his detention as passenger. (*Id.*)

The Government, of course, disagrees that the stop was unlawfully extended. Because "[t]raffic stops are 'especially fraught with danger to police officers,' [ ] an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Rodriguez*, 135 S. Ct. at 1616 (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)). Inquiries such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" are "'ordinary inquiries incident to [the traffic] stop.'" *Id.* at 1615 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005) and citing *Delaware v. Prouse*, 440 U.S. 648, 658–60 (1979)). And although the Court has not "explicitly" held that an inquiry into a passenger's identity is permissible, "its precedent inevitably leads to that conclusion." *United States v. Clark*, 879 F.3d 1, 4 (1st Cir. 2018) (quotation and citation omitted). Thus, the traffic stop was not unlawfully extended when Deputy Hawthorne "asked Defendant his name and then worked to verify the false information the Defendant voluntarily provided." (Government's Post-Hearing Brief, Doc. 26 at PageID 184.) And, on this authority, the Government maintains that the suppression Motion should be denied.

Defendant replies that the Government's position fails to take into account critical qualifying language in *Rodriguez*: "On-scene investigation into *other* crimes, however, detours from that mission. So too do safety precautions taken in order to facilitate such detours." 135 S. Ct. at 1616 (emphasis added) (citations omitted). The "problem" with Deputy Hawthorne's actions, Defendant maintains, "relate to his extension of the traffic stop after he had completed

5

its purpose in order to conduct an investigation of Mr. Kersey." (Reply to Government's Post-Hearing Brief, Doc. 27 at PageID 192.)

Deputy Hawthorne's mobile data computer ("MDC") log reflects that he both called the traffic stop and ran the Camry's license plate at 13:39.[7] He stopped the Camry and messaged Officer Alt at 13:43. (Government Exh. 1 (KERSEY_0146).) Hawthorne ran the driver's information at 13:46, which came back valid. (*Id.* (KERSEY_0147).) At this point, because the driver was not under suspension, Hawthorne determined that he would not issue a citation to him for the lane change violation. (Doc. 24 at PageID 112–13.) *After* he made this determination, Hawthorne *then* ran the name "Joshua Thompson"—the name "volunteered" by Defendant—beginning at 13:47. Coming up with "nothing," at 13:50 he ran the social security number Defendant gave to his partner (who had arrived on scene at 13:48), which returned to a female. (Government Exh. 1 (KERSEY_0148).) It was at this point, Hawthorne testified, that he removed Defendant from the Camry and placed him in his cruiser. (Doc. 24 at PageID 80.) The MDC log indicates that Officer Alt posted a comment at 13:51 that she was *en route* for a car search, with a response from Hawthorne at 13:52 giving the particulars of his location. (Government Exh. 1 (KERSEY_0148).) These entries correspond with Hawthorne's testimony that Alt arrived on scene while he was cautioning Defendant that he needed to provide truthful information to him concerning his identity. (Doc. 24 at PageID 80–81.)

The Court concludes that the purpose of the traffic stop ended at 13:46, when Deputy Hawthorne determined he was not going to ticket the driver of the Toyota Camry. When asked on cross examination whether Defendant "had [any]thing to do with this lane change violation," Hawthorne candidly answered, "No, he did not." (*Id.* at 109–10.) When asked on cross

---

[7] Deputy Hawthorne testified that he actually ran the license plate *before* the vehicle left Kenwood Towne Centre. (Doc. 24 at PageID 93–95.)

examination whether "there was [any]thing you needed from [Defendant] to investigate the lane change which is why you say you stopped the car," Hawthorne likewise candidly answered, "Correct. I did not need anything from him, no." (*Id.*) There was no testimony, and the Government does not argue, that Hawthorne needed extra time to write a warning ticket—in lieu of a citation—so as to complete the stop.[8] And because the driver came back as "valid," no issue remained regarding whether Defendant might need to drive the car away or whether, instead, the car might need to be towed. (*Id.*) *Rodriguez* requires but one result. The additional time period spent investigating Defendant's true identity—during which the positive sniff by K-9 Creed occurred—impermissibly prolonged the stop.

*United States v. Alexander* does not dictate a different outcome. 467 F. App'x 355 (6th Cir. 2012). Although unpublished, *Alexander* cites two published Sixth Circuit cases for the proposition, "In this circuit we have held that in situations similar to the present case, an officer does not violate the Fourth Amendment during a traffic stop by asking for passenger identification, even where there was no reasonable suspicion of any wrongdoing by the passengers." *Id.* at 362 (citing *United States v. Smith*, 601 F.3d 530, 542 (6th Cir. 2010) and *United States v. Ellis*, 497 F.3d 606, 6013–14 (6th Cir. 2007)). *See also United States v. Winters*, 782 F.3d 289, 296 (6th Cir. 2015). At issue, however, is not whether Deputy Hawthorne lawfully could ask Defendant, as passenger, who he was. Rather, at issue is whether Deputy Hawthorne could extend the duration of the detention beyond the completion of the lane violation traffic stop to investigate the two "false identifiers" that Defendant gave to him. And, under *Rodriguez*, the answer is "no."

---

[8] On this subject, Deputy Hawthorne testified that he could not remember the driver's name, but wrote his license number on his "detail" card for the day: "I put the driver's - - driver's license number on there stating that I gave him a warning." (Doc. 24 at PageID 105.)

7

Remaining for deliberation is whether "reasonable suspicion of criminal activity" justified detaining Defendant "beyond completion of the traffic infraction investigation." *Rodriguez*, 135 S. Ct. at 1616–17. And the answer here is "yes." Once the "*Terry* clock"[9] reset, further detention of Defendant must be supported "by an independent reasonable and articulable suspicion that criminal activity was afoot." *Winters*, 782 F.3d at 298 (citing *United States v. Johnson*, 482 F. App'x 137, 143–44 (6th Cir. 2012) (citing *Hill*, 195 F.3d at 264)). "Whether an officer has reasonable, articulable suspicion of criminal activity 'is based on the totality of the circumstances presented to the officer.'" *Id.* (citing *United States v. Jones*, 673 F.3d 497, 502 (6th Cir. 2012)). "The officer 'must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.'" *Jones*, 673 F.3d at 502 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation and citation omitted)). Police officers are, however, "permitted 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *United States v. Shank*, 543 F.3d 309, 315 (quoting *United States v. Martin*, 289 F.3d 392, 398 (6th Cir. 2002)).

The facts proffered by the Government to articulate reasonable suspicion consist of: (1) Defendant's very abrupt entrance into and exit from the shopping mall; (2) Deputy Hawthorne's observation that he saw "older track marks" on Defendant's arms; (3) Deputy Hawthorne's training and experience that drug users tend to steal from retail establishments; (4) the Camry, in which Defendant was riding—driving through the mall parking lot at a "higher" rate of speed;[10] (5) the false name Defendant gave Deputy Hawthorne; and (6) the false social security number

---

[9] *Terry v. Ohio*, 392 U.S. 1 (1968).
[10] Deputy Hawthorne exited the mall parking lot before the Camry did, positioning his patrol car in the middle—or "suicide"—lane on Kenwood Road. (Doc. 24 at PageID 97–98.) The basis for the traffic stop was the Camry's maneuver away from Hawthorne's patrol car *moments* after it passed him. (*Id.*)

Defendant gave to Deputy Rechtin. Considered alone, as Hawthorne conceded during the hearing, Defendant's "disorientation"—whether because he was "intoxicated" or suffering from "a head injury" or "possibly high on drugs"—"wouldn't have fit a law - - any violation of law." (Doc. 24 at PageID 110–11.) But Defendant substantially complicated matters when he lied to Hawthorne—and then Hawthorne's partner—about his identity. Providing a false name, combined with other circumstances of drug (and associated gun) activity, can create reasonable suspicion. *See, e.g., United States v. Jackson*, 663 F. App'x 426, 429 (6th Cir. 2016). Deputy Hawthorne detained Defendant on slightly more than an "ill-defined hunch," *Winters*, 782 F.3d at 298, during which time the positive dog sniff occurred. This is all the Constitution requires. Hence any evidence seized as a consequence, or statements made in connection therewith, will not be suppressed.

### III. CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress Evidence (Doc. 19) is hereby **DENIED**.

**IT IS SO ORDERED**.

Dated: 2/23/18

Judge Susan J. Dlott
United States District Court