# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:17-cr-00116 |
| Plaintiff, | : | Judge Susan J. Dlott |
| v. | : | **ORDER GRANTING DEFENDANT'S MOTION TO RECONSIDER** |
| JOSHUA KERSEY, | : | |
| Defendant. | : | |

This criminal proceeding is before the Court on Defendant's Motion for Reconsideration (Doc. 29), which the United States has opposed (Doc. 34). Defendant previously moved to suppress evidence in this case (Doc. 19), which the United States opposed (Doc. 21). At Defendant's request and to further develop the record, the Court conducted an evidentiary hearing on December 18, 2017. The parties filed post-hearing briefs (Docs. 25–27), and the Court denied Defendant's Motion to Suppress (Doc. 28).

After the Court denied Defendant's Motion to Suppress, the Defendant filed the instant Motion for Reconsideration (Doc. 28). In it, Defendant contends that the Court correctly determined the lawful traffic stop concluded at 13:46, but incorrectly relied on information obtained after that time to justify the extension of the traffic stop. The Government responds that the Deputy in this case had independent reasonable suspicion to extend the traffic stop prior to 13:46. For the reasons that follow, Defendant's Motion for Reconsideration (Doc. 34) is hereby **GRANTED**, and any evidence seized, or statements made, after the lawful traffic stop concluded must be suppressed.

I.  **BACKGROUND**[1]

On May 14, 2017, Hamilton County Deputy Sheriff Joshua Hawthorne was working a routine patrol in District 3, which covers Sycamore Township and includes the Kenwood Towne Centre shopping mall.  (Doc. 24 at PageID 65–66.)  He was inside his marked patrol vehicle, which was parked in the fire lane outside Entry No. 6 (between Macy's department store and Red Robin restaurant) completing an unrelated theft report, when he noticed Defendant walk in front of his vehicle.  (*Id.* at PageID 66, 85–86.)  Defendant "caught [his] eye because he was just walking aimlessly looking around. . . . kind of like he was either intoxicated or . . . didn't have a clear head of some sorts."  (*Id.* at PageID 67, 71, 85.)  Hawthorne noticed "numerous old track marks on [Defendant's] arm by use of possible needles," which he thought "was kind of odd."  (*Id.* at PageID 67.)  He radioed mall security to "put [Defendant] on camera" as he entered the building.  (*Id.* at PageID 68–69.)  Hawthorne observed Defendant enter the mall, remain inside for only 20 seconds or so, and leave.  Defendant then got into the passenger seat of a vehicle—a Toyota Camry—that, according to mall security, backed out of a dedicated parking spot—and drove through the parking lot—at a "higher" rate of speed.  (*Id.* at PageID 69–70.)

Once the vehicle had exited the mall parking lot onto Kenwood Road, Deputy Hawthorne resolved to "find a reason to pull the car over and see what's going on."  (*Id.* at PageID 70.)  That reason came when the driver of the vehicle signaled to change lanes and "instantaneously" did so, in violation of an Ohio traffic law that requires a driver to signal for at least 100 feet before

---

[1] The Court made factual findings following the December 18, 2017 hearing. (Doc. 28).  For clarity, those same factual findings will be repeated here.

changing lanes. (*Id.* at PageID 72–73, 103.)[2] Hawthorne activated his lights and stopped the vehicle in a strip mall parking lot a block away. (*Id.* at PageID 73.)

Deputy Hawthorne approached the vehicle and asked the driver for his license and registration, which were provided. (*Id.* at PageID 73, 104.) He then asked Defendant "if he knew his name." (*Id.* at PageID 73, 108.) Defendant gave him the name "Joshua Thompson" and apparently also provided a date of birth. (*Id.* at PageID 73–74.) Hawthorne then returned to his cruiser. (*Id.* at PageID 74.) He determined that the driver's license was valid but "nothing was coming back" vis-à-vis Defendant. (*Id.*) By this point Hawthorne's partner, Deputy Rechtin, had arrived on scene, and, at Hawthorne's request, Rechtin approached the vehicle and asked Defendant for his social security number. (*Id.* at PageID 74, 114, 117.) The number Defendant gave came back to a female. (*Id.* at PageID 79.) At this point, Hawthorne "decided to pull" Defendant from the car and place him in his cruiser. (*Id.* at PageID 80.) Once inside, Hawthorne told Defendant, "You're just digging yourself a hole. Why don't you give me your correct information[?]" (*Id.*) Explaining that he lied because he thought he "had a warrant out of Kentucky," Defendant then provided Hawthorne with his actual social security number. (*Id.*) No warrant came up, but a computer check revealed Defendant's identity as Joshua Kersey. (*Id.*)

Meanwhile Officer Andrea Alt, from the neighboring jurisdiction of Amberley Village, arrived on scene with her K-9 partner, Creed,[3] who alerted to the driver's side (passenger door seam) of the vehicle. (*Id.* at PageID 154–55, 158.) Deputy Hawthorne had messaged Alt shortly

---

[2] *See* Government Exhibit 7, Ohio Rev. Code § 4511.39 ("Use of signals for stopping, turning, decreasing speed, moving left or right; limitations"). While "not the easiest thing in the world" to gauge, Deputy Hawthorne estimates that 100 feet would amount to "at least three signal blinks if you're traveling on the road." (Doc. 24 at PageID 103.)
[3] K-9 Creed is state certified as both a narcotics detection dog (to include marijuana, cocaine, heroin, methamphetamines, and their derivatives) and a patrol dog (meaning he can track suspects by detecting human odor). (*Id.* at PageID 146–49, 162; Government Exh. 3.)

3

after he "called" the traffic stop[4] "[d]ue to the recent not contact but observations of Mr. Kersey, being that possibly he was drug dependent, possibly [ ] intoxicated." (*Id.* at PageID 77–80, 146.) Alt assisted Hawthorne in searching the vehicle and "almost got stuck with a needle that was pointing straight up." (*Id.* at PageID 155.) She also discovered a revolver under the passenger seat, "and some rounds on the floor." (*Id.* at PageID 156.) Hawthorne took these items "into his custody and placed them into evidence." (*Id.*)

After the vehicle was "cleared," Deputy Hawthorne returned to his cruiser and orally advised Defendant of his *Miranda* rights.[5] (*Id.* at PageID 81, 130.) According to Hawthorne, Defendant admitted the weapon, syringe, and rounds were his. (*Id.*) Hawthorne then said, "I looked at your history. You shouldn't even have a firearm due to being a convicted felon." (*Id.*) In reply, Defendant told Hawthorne "it's the life he lives." (*Id.* at PageID 81–82, 130.) Hawthorne placed Defendant under arrest, charging him with obstructing official business, possession of a drug abuse instrument, and having a weapon under disability. (*Id.* at PageID 82–83.)

Defendant is charged in the Southern District of Ohio with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 2.

## II. ANALYSIS

### A. The Initial Traffic Stop

"An ordinary traffic stop by a police officer is a 'seizure' within the meaning of the Fourth Amendment." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *Del. v. Prouse*, 440 U.S. 648, 653 (1979)). Thus, evidence seized during an illegal traffic stop "must be

---

[4] Deputy Hawthorne explained that his practice is to "call out" his stop before he actually stops a vehicle, "That way I have all the information in case the vehicle does not stop. It's out there over the air. And if we stop somewhere else, I can just give an update on the location." (*Id.* at PageID 78.)
[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

4

suppressed as 'fruits of the poisonous tree.'" *Id.* (citing *United States v. Hill*, 195 F.3d 259, 264 (6th Cir. 1999) (quoting *Wong Sun v. United States*, 371 U.S. 471, 484 (1963))). It is well-established, however, that a police officer "lawfully may stop a car when he has probable cause to believe that a civil traffic violation has occurred." *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012).

A traffic stop, though, is limited by its purpose and may "last no longer than is necessary to effectuate th[at] purpose." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* (citation omitted).

As the Court explained in its previous order, Deputy Hawthorne's traffic stop was lawful, but the traffic stop concluded at 13:46—the time at which the driver's information came back valid and Hawthorne determined that he would not issue a citation for the lane change violation. (Doc. 24 at PageID 112–13.) *After* he made this determination, Hawthorne *then* ran the name "Joshua Thompson"—the name "volunteered" by Defendant—beginning at 13:47. After spending "a couple of minutes" slogging through information, (*Id.* at PgaeID 117), and coming up with "nothing," at 13:50 Hawthorne ran the social security number Defendant gave to his partner (who had arrived on scene at 13:48), which returned to a female. (Government Exh. 1 (KERSEY_0148).) It was at this point, Hawthorne testified, that he removed Defendant from the Camry and placed him in his cruiser. (Doc. 24 at PageID 80.) The MDC log indicates that Officer Alt posted a comment at 13:51 that she was *en route* for a car search, with a response from Hawthorne at 13:52 giving the particulars of his location. (Government Exh. 1 (KERSEY_0148).) These entries correspond with Hawthorne's testimony that Alt arrived on

scene while he was cautioning Defendant that he needed to provide truthful information to him concerning his identity. (Doc. 24 at PageID 80–81.)

The issue currently before the Court, then, is whether the additional time period spent investigating Defendant's true identity—during which the positive sniff by K-9 Creed occurred—impermissibly prolonged the stop. If so, the evidence consequently recovered and the statements subsequently made must be suppressed.

### B. Reasonable Suspicion of Criminal Activity to Extend the Stop

In its prior Order denying Defendant's Motion to Suppress (Doc. 28), the Court found that "reasonable suspicion of criminal activity" justified detaining Defendant "beyond completion of the traffic infraction investigation." (*Id.* at PageID 207 (quoting *Rodriguez*, 135 S. Ct. at 1616–17).) However, the Court's conclusion was based, in part, on the false name Defendant gave Hawthorne and the false social security Defendant gave Deputy Rechtin. (*Id.* at PageID 207–08.) As Defendant notes in his Motion to Reconsider, this information was not known until **after** the stop was concluded at 13:46.

The question the Court must now revisit, then, is whether "reasonable suspicion of criminal activity" existed **at the conclusion of the traffic stop** to justify detaining Defendant "beyond completion of the traffic infraction investigation." *See Rodriguez*, 135 S. Ct. at 1616–17; *see also United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir. 2008) ("[O]nce the purpose of a traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable suspicion that criminal activity was afoot.")). Once the "*Terry* clock"[6] reset, further detention of Defendant must be supported "by an independent reasonable and articulable suspicion that criminal activity was afoot." *United*

---

[6] *Terry v. Ohio*, 392 U.S. 1 (1968).

*States v. Winters*, 782 F.3d 289, 298 (6th Cir. 2015) (citing *United States v. Johnson*, 482 F. App'x 137, 143–44 (6th Cir. 2012) (citing *Hill*, 195 F.3d at 264)).

"Whether an officer has reasonable, articulable suspicion of criminal activity 'is based on the totality of the circumstances presented to the officer.'" *Id.* (quoting *United States v. Jones*, 673 F.3d 497, 502 (6th Cir. 2012)). "[W]e do not employ a 'divide-and-conquer analysis' for each thing an officer witnesses." *United States v. Coker*, 648 F. App'x 541, 545 (6th Cir. 2016) (quoting *United States v. Arvizu*, 534 U.S. 266, 274, 122 S.Ct. 744 (2002)). "The officer 'must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.'" *Jones*, 673 F.3d at 502 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation and citation omitted)). Police officers are, however, "permitted 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *United States v. Shank*, 543 F.3d 309, 315 (quoting *United States v. Martin*, 289 F.3d 392, 398 (6th Cir. 2002)).

In the case at bar, the facts proffered by the Government in an attempt to articulate "reasonable" suspicion at the time the traffic stop concluded consist of: (1) Defendant's 20-second "odd" behavior entering and exiting the shopping mall during which, based on his training and experience, Hawthorne thought Defendant might be "high on drugs and there may be drugs present around him"; (2) Deputy Hawthorne's observation that he saw "older track marks" on Defendant's arms; (3) Deputy Hawthorne's training and experience that drug users tend to steal from retail establishments; and (4) the Camry, in which Defendant was riding, drove through the mall parking lot at a "higher" rate of speed. (Doc. 34 at PageID 221–22.)

Considered alone, Deputy Hawthorne conceded that Defendant's "disorientation"— whether because he was "intoxicated" or suffering from "a head injury" or "possibly high on

7

drugs"—"wouldn't have fit a law - - any violation of law." (Doc. 24 at PageID 110–11.) And it was only on *this* basis that he asked Defendant for his name once the Camry was stopped. (*Id.* at PageID 110.) At the traffic stop, Hawthorne had no reason to suspect that Defendant had stolen anything from the mall as Defendant was observed on camera entering and exiting the mall 20 seconds later. (*Id.* at PageID 89.) By the time the traffic stop concluded at 13:46, any concerns relating to traffic infractions for the car in which Defendant was a passenger had been resolved. (*Id.* at PageID 110.) Thus, without more, the totality of circumstances at 13:46 do not support a reasonable, articulable suspicion of criminal activity.

The traffic stop occurred in the early afternoon, and, as Deputy Hawthorne acknowledged, *not* in a high-crime area. (Doc. 24 at PageID 132.) Rather, the area around Kenwood Towne Centre is affluent, described by Hawthorne as "one of the [ ] better areas to shop." (*Id.* at PageID 88.) While mall security relayed that the vehicle drove through the parking lot at an unspecified "higher" rate of speed, the vehicle did not speed to attempt any sort of "get away" once on Kenwood Road. (*See id.* at PageID 69–70, 99.) That Hawthorne stops vehicles for lane change violations "quite often" but does not "normally" ticket the offending drivers suggests that this infraction poses little—if any—ostensible danger to law enforcement or the public. (*See id.* at PageID 112.) Significantly, the identification provided by the driver was "valid." The vehicle did not have tinted windows designed to conceal the occupants from plain view. And Hawthorne did not testify that either the driver or Defendant appeared nervous or agitated during any portion of the stop.

This was no mere traffic stop. It was Deputy Hawthorne's admirable effort to "finally [get] a good pop" and to make the area he patrols safer for its citizens. (*See* Government Exh. 1

8

(KERSEY_0151); Doc. 24 at PageID 131–33.)[7]  Getting a gun off the street, especially one in the hands of a felon, is "good work" indeed, "and we rightly applaud, respect, and deeply appreciate the brave law enforcement officers who put their lives on the line every day to keep us safe."  *United States v. Hill*, 852 F.3d 377, 385 (4th Cir. 2017) (Davis, S.J., dissenting).  That good work, though, cannot come at the expense of the Fourth Amendment.  Taken as a whole, the circumstances surrounding the extension of the traffic stop did not give rise to the constitutionally-mandated "reasonable suspicion."  Deputy Hawthorne detained Defendant on what the law regards as an "ill-defined hunch," *Winters*, 782 F.3d at 298, and hence any evidence seized, or statements made, after the lawful traffic stop concluded must be suppressed.

### III. CONCLUSION

For the reasons set forth above, Defendant's Motion for Reconsideration (Doc. 29) is hereby **GRANTED**.

**IT IS SO ORDERED**.

Dated: March 23, 2018                     S/Susan J. Dlott_____
                                          Judge Susan J. Dlott
                                          United States District Court

---

[7] Hawthorne's testimony suggests he suspected a narcotics, rather than firearm, violation.  Having failed to note them in any written report, the Court does not credit that portion of his testimony where he recalls seeing "older track marks" on Defendant's arm at the mall, especially since seven months elapsed between the incident and the hearing at which he testified and first mentioned them.  (Doc. 24 at PageID 91–92, 128.)